UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JAMES AVERY RUSH, IV | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 2-03CV-0140J |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | § | |
| Defendant. | § | |

**BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I. Summary of Arguments ................................................................................................1

II. Factual Background ....................................................................................................3

III. Arguments and Authorities .........................................................................................6

    A. General Standard for Injunctive Relief ..............................................................6
    B. Rush will be irreparably harmed without injunctive relief ...............................8
    C. Rush has a learning disability protected by the ADA .......................................9

        1. Definition of disability. ..............................................................................9
        2. The facts show Rush has a disability. ......................................................11

    D. The applicable standard for success on the merits ..........................................13
    E. An injunction will further the public interest ..................................................14
    F. The balance of equities and hardship heavily favors Rush ............................14
    G. Conclusion ......................................................................................................15

Exhibit A. - Dr. Egerton's Report ...................................................................................A

Exhibit B. - Dr. Donald Deshler's Letter Report ............................................................B

# TABLE OF AUTHORITIES

**CASES**             *PAGE(S)*

*Bartlett v. New York State Bd. of Law Examiners*,
226 F.3d 69 (2nd Cir. 1998) ................................................................................ 11

*Beacon Theatres, Inc. v. Weaver*,
359 U.S. 500 (1959) ............................................................................................. 9

*Bercovitch v. Baldwin Sch., Inc.*,
133 F.3d, 141(1st Cir. 1998) .............................................................................. 11

*Cho v. Itco, Inc.*,
287 F.Supp. 1183 (E.D. Tex. 1991) ................................................................ 8, 13

*Compact Van Equip., Co. v. Leggett & Platt, Inc.*,
566 F.2d 952 (5th Cir. 1978) ............................................................................... 7

*FTC v. Southwest Sunsites, Inc.*,
665 F.2d 711 (5th Cir.), cert. denied, 456 U.S. 973 (1982) ................................ 7

*Gonzalez, v. National Bd. of Medical Examiners*,
225 F.3d at 626 ............................................................................................. 10, 11

*Hoover v. Morales*,
164 F.3d. 221 (5thCir. 1998) ........................................................................... 7, 8

*Millennium Restaurants Group, Inc. v. City of Dallas, Texas*,
181 F.Supp.2d 659 (N.D. Tex. 2001) .................................................................. 9

*Otero Sav. & Loan Ass'n. v. Federal Reserve Bank*,
665 F.2d 275 (10th Cir. 1981) ........................................................................... 13

*Productos Carnic, S.A. v. Central AM. Beef*,
621 F.2d 683 (5th Cir. 1980) ........................................................................ 7, 13

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
805 F.2d 350 (10th Cir. 1986) ....................................................................... 7, 13

*U. S. v. White*,
893 F.Supp. 1423 (C.D. Cal. 1995) ..................................................................... 8

## TABLE OF AUTHORITIES (continued)

**CASES**                                                                 **PAGE(S)**

*University of Texas v. Camenisch*,
    451 U.S. 390 (1981) ............................................................................................................ 7

*Women's Medical Ctr. of Northwest Houston v. Bell*,
    248 F.3d 411 (5th Cir. 2001) ........................................................................................ 7, 8

**STATUTES**

28 C.F.R. Pt. 36, app.b ................................................................................................................ 11

28 C.F.R. § 36.104 ...................................................................................................................... 10

28 C.F.R. § 36.104(2) .................................................................................................................. 11

28 C.F.R. § 36.309(b)(1)(I) ......................................................................................................... 10

28 C.F.R. § 36.309(b)(2) ............................................................................................................. 10

42 U.S.C. § 12101(b)(1) and (2) ............................................................................................ 6, 14

42 U.S.C. § 12102(2)(A) ............................................................................................................. 10

42 U.S.C. § 12112(b)(5)(A) ........................................................................................................ 10

42 U.S.C. § 12188 ......................................................................................................................... 8

42 U.S.C. § 12188(a) .................................................................................................................... 7

42 U.S.C. § 12188(1)(a) ................................................................................................................ 7

42 U.S.C. § 12189 ............................................................................................................... 7, 9, 10

42 U.S.C. § 2000a-3(a) ................................................................................................................. 7

TO THE HONORABLE COURT:

James Avery Rush, IV ("Rush"), Plaintiff herein, files this Brief in Support of his Motion for Preliminary Injunction.

### I. Summary of Argument

Rush has Attention Deficit with Hyperactivity Disorder ("ADHD") and a reading disability, two conditions that substantially impact his major life activities of learning, reading and working. His learning or reading disability is a reduced ability to process the written word, which requires him to take a substantially longer amount of time than most people to read and to process information that he does read. The severity of his disability is illustrated by his performance on the Woodcock-Johnson test batteries, which include the following results:

a. in processing speed Rush is in the bottom 0.4 percentile of persons with similar educational background and in the bottom 8 percentile of all 26 years olds;

b. in cognitive efficiency, Rush is in the bottom 1 percentile of persons at similar educational levels and in the bottom 12 percentile of all 26 year olds; and

c. in cognitive fluency, Rush scored in the lowest 0.1 percentile of those with similar educational backgrounds and in the 0.5 percentile for all 26 year olds.

The substantial impairment of his major life activities of learning and reading constitutes a disability that is entitled to protection under the ADA.

Prior to being formally diagnosed with learning disabilities, Rush received informal accommodations of extra time on exams in secondary school, college at the University of Oklahoma and in graduate school. After being formally diagnosed, Rush received the reasonable accommodation of additional time to take the medical school entrance exam (MCAT) and for exams throughout his medical school career. With these various accommodations, Rush has been able to succeed in school.

Having just completed his second year of medical school at the Texas Tech University School of Medicine ("Medical School") in Lubbock, Texas, Rush is preparing to take the United States Medical Licensing Examination ("USMLE") Step 1 Exam, an examination that is a prerequisite to continuing medical school and to being licensed to practice medicine. The USMLE is administered nationwide by Defendant, the National Board of Medical Examiners ("NBME").

As part of his application to take the USMLE, Rush submitted documentation of his learning disability and requested the reasonable accommodation of additional time to take the exam. NBME rejected Rush's request in late March 2003. Rush then provided additional information and requested reconsideration. Again, the NBME denied his request. Rush then sought additional evaluations of his condition from Dr. David Egerton of the Texas Tech University School of Medicine and Dr. Donald Deshler of the University of Kansas. These experts in the field of learning disabilities concluded that Rush has learning disabilities and provided reports that Rush submitted to the NBME as a third request for the reasonable accommodation of additional time. NBME has again refused to provide Rush any accommodation.

NBME refuses to acknowledge Rush's disabilities and refuses to provide a reasonable accommodation of his disabilities. The NBME's refusal to grant these reasonable accommodations is in direct violation of the Americans with Disabilities Act ("ADA"). In this action, Rush seeks a preliminary injunction requiring the NBME to comply with the ADA and provide him additional time for the USMLE Step 1 exam. Rush also seeks a permanent injunction requiring NBME to provide similar reasonable accommodations in connection with the future USMLE Step examinations that Rush must take as part of his medical licensure process.

## II.  Factual BackgroundError! Bookmark not defined.

Rush is a second year student at the Medical School. In preparation for his third year of medical school, Rush is required to take the USMLE Step 1. Rush is presently scheduled to take the USMLE Step 1 on July 2, 2002, the week before his third year rotations begin.

Rush has a long history of learning difficulties.[1] Teachers in junior high and high school recognized that Rush had difficulty finishing timed examinations in the same manner as other students. Most teachers, after recognizing his difficulties, provided Rush with informal accommodations, including additional time to complete his projects and tests. Rush's scores on the Scholastic Aptitude Test ("SAT") college entrance exam were lower than expected, given his grade point average from high school. His difficulties regarding timed examinations and significant reading projects continued during his undergraduate work at the University of Oklahoma. He was able to succeed, in part, at the college level by virtue of being a mathematics major, where reading requirements were less of a concern, by professors allowing extra time for completing timed exams, and by his non-timed out-of-class work being of such quality to offset the difficulties of timed exams. Rush also received informal accommodations while in graduate school working on his master's degree

Rush initially took the MCAT without any accommodations and received a score of 19. A score of 19 is well below average and is not sufficient for entry into any accredited medical school in Texas.[2] Rush, thinking the 19 was an aberration, took the MCAT a second time in with no accommodations and again scored a well below average 19. On both occasions, he was unable to complete substantial parts of the tests.

---

[1] See Dr. David Egerton's Report of Psychological Examination ("Egerton Report") attached hereto as Exhibit A and incorporated herein for all purposes.

[2] An average score on the MCAT is 24. Typically a score of at least 21 is needed to gain any attention in trying to get admitted to a Texas based medical school. See Egerton Report.

After scoring 19 the second time, Rush recognized there may be a bigger concern and sought an evaluation of whether he had specific learning related problems. Rush was examined in a comprehensive, individual, psycho-educational evaluation in 1998. That examination concluded that Rush had significant visual perceptual processing weaknesses that resulted in his being unable to process information and written materials as quickly as most other persons. Accordingly, Rush was diagnosed with a disability that substantially impaired his learning, reading and writing activities. It was recommended that he be provided additional time on timed examinations to accommodate this disability.

As a result of the initial diagnosis, Rush sought formal accommodation to take the MCAT a third time. His request for accommodation was approved based on his disability; and, with the accommodation, he achieved a score of 25. The substantial increase of 6 points (from 19 to 25) on this exam demonstrates that reasonable accommodation of his disability through additional time was warranted.

Using the revised MCAT score, Rush was able to obtain an interview and, ultimately, admission to the Texas Tech University School of Medicine in Lubbock, Texas. Rush presented his diagnosis and history of a learning disability to the Medical School and received accommodation under the ADA from the Medical School throughout his studies, including the accommodation of additional time for timed examination.

Texas Tech University requests that prior to beginning the third year of medical school, students take the USMLE Step 1. Performance on the USMLE Step 1, in addition to being a prerequisite to continuing medical studies, is a primary factor for deciding where a candidate may qualify and be accepted for residency training.

In January 2003, Rush made application to take the USMLE Step 1 in the quarter of May through July 2003. He also made a request to the NBME for a reasonable accommodation based

on his learning disability. Rush presented NBME with the same information used by the MCAT and the Texas Tech School of Medicine to grant Rush the accommodation of additional time on exams. On March 27, 2003, the NBME denied Rush's request for accommodation without any independent interview, evaluation or testing of Rush.

On April 21, 2003, Rush again wrote to NBME providing additional information and evidence concerning his disability and asking that the decision denying his request for accommodation be reconsidered. On or about April 25, 2003, the NBME, summarily denied Rush's request for reconsideration and his request for accommodation, again without any personal examination, evaluation, or interview of him.

After the April 25, 2003 denial of his accommodation request, Rush sought further evaluation of his learning disability through an examination by Dr. David Egerton, a professor in the psychology department of the Texas Tech University School of Medicine. Dr. Egerton examined Rush in a comprehensive battery of tests and conducted an extensive interview of Rush and his history of learning difficulties. Dr. Egerton's report confirms the prior diagnosis that Rush has significant learning disabilities. *See* Egerton Report. In essence, Dr. Egerton found that Rush cannot process information and the written word in the same manner as most people. He is severely disadvantaged in reading and, therefore, in taking timed exams. Dr. Egerton concluded that Rush has a learning disability that substantially limits his ability to learn, read and write. *Id.*

Dr. Egerton also diagnosed Rush with ADHD. ADHD is well recognized learning disability. Individuals with ADHD have difficulty maintaining focus on matters for extended periods of time and may become easily distracted from the task at hand through no fault of their own. In a time test situation where intensive focus for extended periods is required, they have difficulty succeeding because their physical and mental makeup makes it impossible to maintain

focus for that length of time. Accordingly, they are disadvantaged in that the lack of focus for any portion of a test period will preclude them from completing as much of the exam as other non-affected persons. Dr. Egerton concluded that an appropriate, reasonable accommodation for Rush's specific disabilities would be to provide additional time (up to double time) on timed examinations.

Dr. Donald Deshler, a nationally recognized expert in the field of learning disabilities and who is the Director of the Center for Learning Disabilities at the University of Kansas in Lawrence, Kansas, reviewed Dr. Egerton's report and diagnosis of Rush's disabilities. Dr. Deshler agreed with Dr. Egerton's conclusion that the evaluation results show Rush has verified learning disabilities that substantially impair his activities learning and reading.[3]

Rush provided both the Egerton and Deshler reports to the NBME as further evidence of Rush's disabilities and entitlement to an accommodation under the ADA. The NBME, however, still refuses to provide a reasonable accommodation to Rush on the USMLE exam.

### III. Arguments andAuthorities

**A. General Standard for Injunctive Relief.**Error! Bookmark not defined.

The ADA was enacted in part, to provide "a clear and comprehensive national mandate for the elimination of discrimination …and to provide clear, strong, consistent, enforceable standards addressing discrimination…." 42 U.S.C. §12101(b)(1) and (2). The ADA specifically states that

> Any person that offers examinations or courses related to applications, licensing, or credentialing for secondary and post secondary education, professional, or trade purposes shall offer such examination or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. 42 U.S.C. §12189.

---

[3] *See* Letter Report of Dr. Donald Deshler, attached hereto as Exhibit B and incorporated herein for all purposes.
Brief In Support - Page 6

J:\08017\02\Pleadings\0801702003.rev.doc

The ADA specifically includes the remedies set forth in 42 U.S.C. §2000a-3(a) for any violation of §12189, including preliminary and permanent injunctive relief. *See* 42 U.S.C. §12188(1)(a). Section 2000a-3(a) specifically provides that temporary or permanent injunctive relief is available as a remedy to persons aggrieved and to prevent further violations of law. 42 U.S.C. §2000a-3(a).

In general, the role of injunctive relief is to prevent a future harmful act and preserve the court's ability to render a meaningful decision on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 719 (5th Cir.), cert. denied, 456 U.S. 973 (1982); s*ee also Tri State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 350, 355 (10th Cir. 1986) ("in issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.") (citing *Compact Van Equip., Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978)). Even though injunctive relief is an extraordinary remedy, courts grant the remedy when necessary to prevent irreparable injury and to preserve the plaintiff's ability to obtain meaningful judgment. *Productos Carnic, S.A. v. Central AM. Beef*, 621 F.2d 683, 686 (5th Cir. 1980). Preventing an ongoing violation of the ADA and reserving the ability to grant the protection authorized and guaranteed under the ADA clearly is within the realm of appropriate injunctive relief. *See* 42 U.S.C. §12188(a).

To obtain injunctive relief, the movant usually must show:

a. the movant will suffer irreparable injury unless the injunction is issued;

b. a substantial likelihood the movant will prevail at trial;

c. that the threatened injury to movant outweighs any harm to the defendant; and

d. that the injunction will not be adverse to the public interest.

*Women's Medical Ctr. of Northwest Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001); *Hoover*

*v. Morales*, 164 F.3d. 221, 224 (5th Cir. 1998). The ADA specifically states, however, that one available remedy for redressing ADA violations is injunctive relief. 42 U.S.C. §12188. By specifically providing a statutory cause of action for injunctive relief for violations of the ADA, it is not necessary for Rush to establish irreparable harm. *See U.S. v. White*, 893 F.Supp. 1423 (C.D. Cal. 1995). Nevertheless, there is no adequate remedy at law and Rush will be irreparably harmed by denial of the injunctive relief. *See Cho v. Itco, Inc.*, 287 F.Supp. 1183 (E.D. Tex. 1991).

### B. Rush will be irreparably harmed without injunctive relief.

To continue his medical school career and be licensed as a practicing physician in the State of Texas, Rush must take and pass all three of the USMLE Step exams. The time for taking the Step 1 exam is now, before beginning the third year of medical school. Texas Tech requires that students take the exam before beginning the third year of school. In addition to being required as part of the medical school curriculum, the USMLE Step 1 exam is an important factor for students vying for residency programs at offering institutions. Residency institutions will use Rush's score on the USMLE Step 1 Exam to determine whether he is a qualified candidate for their programs.

If a student with Rush's disabilities is required to take the USMLE without reasonable accommodations, the learning disabilities put him at a distinct disadvantage, as compared to most people, and certainly his peers taking the exam. The playing field for the USMLE will not be level, and Rush's performance on the test will not be a full and complete measure of his abilities. The result is most likely a failing score. The consequences of a failing score are that he will fall behind his peers at school.

In the event he fails the exam, he will be forced either to take time out from his medical school studies to prepare for and retake the USMLE Step 1 or, alternatively, request a leave of

absence from the Medical School to allow him to successfully complete the USMLE Step 1. Under either scenario, Rush would be behind his peers at school, which will raise a red flag for any residency program to which he may apply. Thus, whether Rush fails or passes with a lower score, because no accommodation is provided, his future residency and medical training opportunities will be substantially harmed. Ultimately, if he is unable to pass the exam because his disabilities are not accommodated, as required by the ADA, Rush would be asked to leave medical school and give up his dream of becoming a medical doctor. Thus, his whole future as a physician may be impacted by this one exam.

The significance of the USMLE examination demonstrates why injunctive relief is necessary. There simply is no adequate remedy at law if Rush is denied his rights to reasonable accommodation. Sadly, no future judicial remedy could correct or undo the consequences of such events; there is no amount of money or other remedy at law that could compensate him for the loss he could suffer. Moreover, the only real remedy under Title III of the ADA is injunctive relief. There being no adequate remedy at law, Rush will suffer irreparable harm if NMBE is allowed to violate Rush's ADA right and withhold the accommodation to which he is entitled. *See Beacon Theatres, Inc. v. Weaver*, 359 U.S. 500, 506-07 (1959); *Millennium Restaurants Group, Inc. v. City of Dallas, Texas*, 181 F.Supp.2d 659, 666-67 (N.D. Tex. 2001).

  C. **Rush has a learning disability protected by the ADA.**

    1. **Definition of disability.**

Title III of the ADA prohibits discrimination against persons with disabilities in professional examinations and requires that such examinations be provided in a manner that is accessible to persons with such disabilities. 42 U.S.C. §12189. The Department of Justice ("DOJ") regulations promulgated under Title III of the ADA require that examinations covered by 42 U.S.C. §12189 be selected and administered in a manner that accurately reflects the

individuals aptitude or achievement level rather than reflecting the individual's specific impairment.[4] An entity subject to 42 U.S.C. §12189 discriminates against a disabled individual in violation of the ADA when it fails to make a reasonable accommodation for a known physical or mental impairment. 42 U.S.C. §12112(b)(5)(A). The regulations promulgated under Title III of the ADA also specifically state that changes in the length of time permitted for completing an examination may be an appropriate accommodation. 28 C.F.R. §36.309(b)(2).

The NBME administers the USMLE as a nationwide examination for prospective physicians, which must be successfully completed to obtain a medical license in the United States. Accordingly, the NMBE is a covered entity and is required to comply with the provisions of Title III of the ADA. *See Gonzalez v. National Bd. of Medical Examiners*, 225 F.3d 620, 626 (6th Cir. 2000). Because the NBME is subject to the ADA and a request for additional time is an appropriate accommodation, the issue is whether Rush has a disability that is protected under the ADA.

For purposes of the ADA, a person is disabled if he or she suffers from a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42. U.S.C. §12102(2)(A). Although the ADA does not specifically define all of the terms used in the definition of disability, the DOJ, who has authority to implement regulations under Title III of the ADA, defines physical or mental impairment as including "specific learning disabilities." 28 C.F.R. §36.104. These regulations further define major life activity as including

---

[4] 28 C.F.R. §36.309(b)(1)(i) states:

> "an examination covered by this Section must assure that (i) the examination is selected and administered so as to best insure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)."

"walking, seeing, hearing, speaking, breathing, learning and working." *Id.* §36.104(2). In interpreting the regulations, courts have concluded that the major life activity of learning includes reading and writing. *See Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 80 (2nd Cir. 1998); *Gonzalez*, 225 F.3d at 626; *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d, 141, 155 (1st Cir. 1998).

### 2. The facts show Rush has a disability.

The substantially limits standard set forth in the ADA is not specifically defined in the statute. The preamble to the DOJ regulations, however, states "a person is considered an individual with a disability . . . when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 36, app.b.

The evidence presented in this case shows that Rush has a mental impairment, specifically ADHD and a reading disability, that substantially limits his major life activities of learning, reading or writing. The test data compiled by Dr. Egerton dramatically illustrates the scope of Rush's learning disability. Dr. Egerton subjected Rush to the Woodcock-Johnson III test of cognitive abilities and test of achievement. The results for various clusters of the test show that certain of Rush's processing and reading related skills and abilities are far below those of other 26 year old individuals and far below those expected of persons with his academic background. For example, in processing speed Rush scored in the lowest 0.4 percentile versus persons with equivalent education and only in the lowest 8 percentile for all 26 year olds; on cognitive efficiency he scored in the bottom 1st percentile of those at the same education level and in the bottom 12th percentile versus all 26 year olds. Most notably, in the area of cognitive fluency he scored in the lowest 0.1 percentile for grade 18 individuals and less than the lowest 0.5 percentile versus all 26 year olds.

Dr. Egerton did not rely solely on test data in determining that Rush has learning disabilities. He also analyzed Rush's history of learning difficulties. Dr. Egerton finds significant the fact that Rush had identifiable reading difficulties as early as the second grade. As noted above, those difficulties continued through middle school, high school and college, where he received informal accommodations from teachers who recognized his inability to process information and thus deal adequately in timed situations.

The test data, coupled with his history of reading difficulties, establishes that, as compared to most people, Rush is restricted as to the conditions, manner and duration under which he can perform the skills related to reading. Accordingly, he has a disability that substantially limits a major life activity and he is entitled to reasonable accommodation in accordance with Title III of the ADA.

The fact that Rush's learning disabilities were not recognized early in life is not uncommon. Dr. Deshler notes that learning disabilities, although recognizable in hindsight, are not diagnosed when other abilities of the individuals such as mathematical and achievement abilities overshadow the disability. In his opinion, the full extent of Rush's disability, which has always existed, is now being manifested in his inability to process information as most people would.

Rush's experience with the medical school entrance exam, the MCAT, confirms Dr. Deshler's and Dr. Egerton's conclusions. Twice Rush sat for the MCAT without any accommodation. Both times he scored 19, a score too low to obtain any interview for entry into an accredited medical school in the State of Texas. After being provided a reasonable accommodation for the disability in the form of additional time, Rush retook the MCAT and scored 25. That score was sufficient to get Rush admitted into the Texas Tech University School of Medicine.

All of these factors establish one clear picture: Rush has learning disabilities that substantially limit his major life activities of learning, reading and writing as compared to most people.

**D.    The applicable standard for success on the merits.**Error! Bookmark not defined.

The probability of success that Rush must show to warrant injunctive relief depends largely on the sufficiency of proof of the other elements required for injunctive relief. "Where the other factors are strong, a showing of some likelihood of success on the merits would justify temporary injunctive relief." *Productos Carnic*, 621 F.2d at 683.  The Tenth Circuit similarly phrased the issue as follows:

> When the first three requirements for a preliminary injunction are satisfied, the moving party's burden of proof on the fourth requirement is lessened 'It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'

*Tri-State Generation*, 805 F.2d at 358 (quoting *Otero Sav. & Loan Ass'n. v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981)); *see also Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D. Tex., 1991) (applying the "fair ground for litigation" standard where the other factors are strongly shown).

Rush has strong evidence and authorities that establish every element required for injunctive relief, including showing that he will be irreparably harmed if the injunctive relief is not granted.  Accordingly, Rush need only show some likelihood of success; he need only raise serious, substantial, difficult and doubtful questions that create a fair ground for litigation. Clearly, Rush meets this burden.

The evidence outlined above raises more than just a serious, substantial and difficult question and creates more than fair ground for litigation.  It shows that Rush has learning

disabilities that preclude him from performing the tasks of learning and reading in the same manner as compared to most people. Those disabilities substantially limit his major life activities of learning, reading and writing. Under Title III of the ADA, Rush is entitled to have those ADA rights acknowledged and protected by the NBME through the reasonable accommodation of additional time. 42 U.S.C. §12189. This showing, along with the other showings that the balance of the hardships tips in his favor significantly, that the injunctive relief furthers the public interest in supporting the rights of the disabled under the ADA, and that he will suffer irreparable injury if the injunctive relief is not entered, entitles Rush to the injunction as sought herein.

   E. **An injunction will further the public interest.**

The clear legislative mandate behind enactment of the ADA indicates that protection of rights recognized by the ADA is in the public interest. *See* 42 U.S.C. § 12101(b)(1) and (2). Accordingly, the public interest in the ADA is furthered by ordering those who refuse to provide accommodations to disabled individuals to provide reasonable accommodations and comply with the law.

   F. **The balance of equities and hardship heavily favors Rush.**

The potential injury to Rush as indicated above could be devastating. As a result of NBME's refusal to provide the reasonable accommodations required by the ADA, Rush could loose his opportunity to be a medical doctor. The potential hardship to Rush, therefore, is very significant and, as noted above, could result in an irreparable injury to him.

The NBME, however, will suffer little if any hardship from an injunction. The NBME simply administers a nationwide test to all prospective medical students. The NBME has provided accommodations to test participants in the past and providing an accommodation to Rush in this instance would do nothing to reduce NBME's ability to administer tests as it always

has to future students. The bottom line is that an injunction has no significant impact on the NBME or its ongoing operations. Accordingly, the balance of equities and hardships weighs not just heavily in Rush's favor, but totally in Rush's favor.

### G.     Conclusion

The Court should act to preserve and protect Rush's rights under the ADA and to preserve Rush's rights to be accommodated for his disability in accordance with the ADA. Without the injunction, Rush will suffer irreparable injury, and the mandate of the ADA, as noted by Congress when it passed the legislation, will be violated. The Court should not allow the NBME to ignore the requirements of the ADA at the expense of a young man's future and livelihood.

Rush, therefore, respectfully prays that this Court grant his motion for preliminary injunction, require the defendant immediately to cease and desist from violating his ADA rights by refusing to grant him a reasonable accommodation and order the NMBE to comply with the ADA by providing Rush with double time in which to take the USMLE Step 1 examination as presently scheduled on July 2, 2003.

Respectfully submitted,

John Mozola, SBOT# 14615500
Vincent E. Nowak, SBOT # 15121550
Brad A. Chapman, SBOT# 04119010
MULLIN HOARD & BROWN, LLP
500 S. Taylor, Suite 800
P. O. Box 31656
Amarillo, Texas 79120-1656
806.372.5050
806.372.5086 (Fax)

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Motion for Preliminary Injunction was served on counsel for the Defendant via hand delivery, addressed as follows:

>Thomas C. Riney
>Gibson, Ochsner & Adkins, L.P.P.
>701 S. Taylor, Ste. 500
>Amarillo, TX 79101

>*Attorney for Defendant National Board of Medical Examiners*

Brad A. Chapman